No. 21-14027-G

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

## JAMAL COLLINS,

*Plaintiff–Appellant,*

v.

## THOMAS FERRELL,

*Defendant–Appellee.*

---

On Appeal from the United States District Court
for the Southern District of Georgia
Case No. 5:18-cv-00073-LGW-BWC

---

## BRIEF FOR APPELLANT

Caleb P. Redmond
  *Court-Appointed Counsel of Record*
Christopher DiPompeo
Benjamin P. Constine
Joseph Kiessling
JONES DAY
51 Louisiana Ave., NW
Washington, D.C. 20001
Telephone: (202) 879-3939
  *Counsel for Appellant*
  *Jamal Collins*

*Collins v. Ferrell*
Appeal No. 21-14027-G

# CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

As required by Eleventh Circuit Rule 26.1, below is a list of persons and entities who may be interested in the outcome of this case:

Brooks, Joshua K., Former Counsel for Defendant-Appellee;

Carr, Christopher M., Attorney General, Counsel for Defendant-Appellee;

Chalmers, Roger A., Senior Assistant Attorney General, Counsel for Defendant-Appellee;

Cheesbro, The Honorable Benjamin W., United States Magistrate Court Judge for the Southern District of Georgia;

Collins, Jamal E., Plaintiff-Appellant;

Constine, Benjamin, Attorney for Plaintiff-Appellant;

Cusimano, Ellen, Assistant Attorney General, Counsel for Defendant-Appellee;

DiPompeo, Christopher, Attorney for Plaintiff-Appellant;

Ferrell, Thomas, Defendant-Appellee;

Kiessling, Joseph, Attorney for Plaintiff-Appellant;

Martyn, Elizabeth, Defendant;

Pacious, Kathleen M., Deputy Attorney General, Counsel for Defendant-Appellee;

Redmond, Caleb, Attorney for Plaintiff-Appellant;

Waldbeser, Drew, Counsel for Defendant-Appellee;

*Collins v. Farrell*
Appeal No. 21-14027-G

Wood, The Honorable Lisa G., United States District Court Judge for the Southern District of Georgia.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-3(b), Plaintiff-Appellant Jamal Collins certifies that no publicly traded company or corporation has an interest in the outcome of this case.

Dated: October 3, 2022

/s/ *Caleb P. Redmond*
Caleb P. Redmond
*Counsel for Appellant*
*Jamal Collins*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff–Appellant Jamal Collins respectfully requests oral argument. This Court appointed counsel to represent Mr. Collins as he seeks to vindicate his Eighth Amendment right to medical treatment. Mr. Collins' walking cane and wheelchair were confiscated by prison medical personnel, which caused Mr. Collins to seriously injure his knee 10 days later. Making matters worse, Mr. Collins' doctor then cycled through ineffective treatments for months, and Mr. Collins lived in pain for almost a year before knee surgery. This appeal presents record-intensive issues related to these vital constitutional interests. Mr. Collins submits that oral argument would assist the Court in reviewing the record and in resolving the important constitutional issues presented here.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND
    CORPORATE DISCLOSURE STATEMENT ............................................. CIP-1

STATEMENT REGARDING ORAL ARGUMENT ..................................................... i

TABLE OF AUTHORITIES ................................................................................. iv

INTRODUCTION ............................................................................................... 1

STATEMENT OF JURISDICTION ......................................................................... 4

STATEMENT OF THE ISSUES ............................................................................. 4

STATEMENT OF THE CASE ............................................................................... 5

    A.   Mr. Collins breaks his kneecap, receives surgery, and
        uses a walking cane and Tylenol #3 to cope with pain ................................. 5

    B.   Growing "tired of hearing" about "this pain nonsense,"
        Dr. Ferrell confiscates Mr. Collins' walking cane, and
        Mr. Collins' wheelchair is also taken ................................................. 9

    C.   Ten days after Dr. Ferrell confiscated his walking cane,
        Mr. Collins reinjures his knee while walking ................................. 11

    D.   Dr. Ferrell refuses to prescribe Tylenol #3 ..................................... 12

    E.   Mr. Collins undergoes another knee surgery .................................... 13

    F.   Mr. Collins files suit for deliberate indifference, which
        the District Court dismisses on summary judgment ....................... 13

SUMMARY OF THE ARGUMENT ....................................................................... 16

STANDARD OF REVIEW ................................................................................... 19

ARGUMENT .................................................................................................... 20

I.   A REASONABLE JURY COULD FIND THAT DR. FERRELL WAS
    DELIBERATELY INDIFFERENT TO MR. COLLINS' NEED FOR
    PRESCRIBED MOBILITY AIDS ................................................................. 20

    A.   Evidence supports a reasonable finding of serious medical
        need for Mr. Collins' prescribed cane and wheelchair ................... 22

    B.   Evidence supports a reasonable finding that Dr. Ferrell
        disregarded a known risk of serious harm ...................................... 24

# TABLE OF CONTENTS
(continued)

**Page**

1.    A reasonable jury could find that Dr. Ferrell confiscated Mr. Collins' mobility aids as a reckless expression of frustration, not an exercise of medical judgment.................................24

2.    At minimum, a reasonable jury could find that Dr. Ferrell provided grossly inadequate, cursory treatment that was not medical care at all.................................................................31

3.    A reasonable jury could find deliberate indifference even though Dr. Ferrell had provided some other medical treatment.......................................................................35

II.   A REASONABLE JURY COULD FIND THAT DR. FERRELL'S FAILURE TO PROVIDE EFFECTIVE AND RECOMMENDED PAIN TREATMENT CONSTITUTED DELIBERATE INDIFFERENCE.............................37

   A.   Evidence supports a reasonable finding of intentional interference with recommended treatment.......................................38

   B.   Evidence supports a reasonable finding of ongoing "treatment" that Dr. Ferrell knew to be ineffective ...........................................40

CONCLUSION ...................................................................................43

# TABLE OF AUTHORITIES

**Page(s)**

CASES*

Adams v. Poag,
   61 F.3d 1537 (11th Cir. 1995) .................................................. 36, 43

*Ancata v. Prison Health Servs., Inc.,
   769 F.2d 700 (11th Cir. 1985) .................................................. passim

Bingham v. Thomas,
   654 F.3d 1171 (11th Cir. 2011) .................................. 24, 25, 38, 40

Bismark v. Fisher,
   213 F. App'x 892 (11th Cir. 2007) ............................................ 38

Brown v. Hughes,
   894 F.2d 1533 (11th Cir. 1990) .................................................. 22

Brown v. Johnson,
   387 F.3d 1344 (11th Cir. 2004) .................................................. 20

Carswell v. Bay Cnty.,
   854 F.2d 454 (11th Cir. 1988) .................................................... 35

Estelle v. Gamble,
   429 U.S. 97 (1976) ................................................................ 1, 20

Farmer v. Brennan,
   511 U.S. 825 (1994) .............................................................. 21, 27

*Farrow v. West,
   320 F.3d 1235 (11th Cir. 2003) ............................................... passim

Gilmore v. Hodges,
   738 F.3d 266 (11th Cir. 2013) .................................................... 25

Goebert v. Lee Cnty.,
   510 F.3d 1312 (11th Cir. 2007) .................................................. 21

Greeno v. Daley,
   414 F.3d 645 (7th Cir. 2005) ..................................................... 40

Guevara v. NCL (Bahamas) Ltd.,
   920 F.3d 710 (11th Cir. 2019) .................................................... 19

---

* Citations on which Mr. Collins chiefly relies are marked with an asterisk.

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Harris v. Coweta Cnty.*,
   21 F.3d 388 (11th Cir. 1994) ........................................................24

*Hoffer v. Sec'y, Fla. Dep't of Corr.*,
   973 F.3d 1263 (11th Cir. 2020) ...................................................25

*Mandel v. Doe*,
   888 F.2d 783 (11th Cir. 1989) ............................... 22, 28, 32, 35

*\*McElligott v. Foley*,
   182 F.3d 1248 (11th Cir. 1999) ............................................*passim*

*Parzyck v. Prison Health Servs., Inc.*,
   290 F. App'x 289 (11th Cir. 2008) ..............................................22

*Patel v. Lanier Cnty.*,
   969 F.3d 1173 (11th Cir. 2020) .............................................. 19, 30

*Rogers v. Evans*,
   792 F.2d 1052 (11th Cir. 1986) ...................................................35

*\*Steele v. Shah*,
   87 F.3d 1266 (11th Cir. 1996) ........................................32, 33, 34

*Taylor v. Adams*,
   221 F.3d 1254 (11th Cir. 2000) ........................................20, 22, 23

*Waldrop v. Evans*,
   871 F.2d 1030 (11th Cir. 1989) ........................................35, 41, 42

**STATUTES**

U.S. Const. amend. IV .........................................................................4

U.S. Const. amend. VIII .................................................................. 4, 20

28 U.S.C. § 1291 ...............................................................................4

28 U.S.C. § 1331 ...............................................................................4

42 U.S.C. § 1983 .......................................................................... 4, 13

**OTHER AUTHORITIES**

Fed. R. App. P. 4 ...............................................................................4

Fed. R. Civ. P. 56 .............................................................................19

Fed. R. Civ. P. 59 ...............................................................................4

## INTRODUCTION

This appeal challenges the District Court's refusal to allow a jury to decide this clearly triable case.   Plaintiff Jamal Collins introduced substantial evidence to demonstrate that Defendant Thomas Ferrell had violated the Eighth Amendment through his deliberate indifference to Mr. Collins' serious medical needs.   Yet the District Court granted Dr. Ferrell's motion for summary judgment.   In doing so, the District Court not only overlooked facts a jury could reasonably rely on to find in favor of Mr. Collins, but also cited facts establishing deliberate indifference as somehow demonstrating the opposite.   That approach inverts the summary judgment standard, wrongly viewing the evidence in the light most favorable to the party requesting summary judgment.

The overarching issue here is whether a jury could reasonably infer that Dr. Ferrell violated the Eighth Amendment's ban on cruel and unusual punishments.   The Eighth Amendment prohibits imposing the "unnecessary and wanton infliction of pain," and forbids a prison official from injuring an inmate through "deliberate indifference to serious [his] medical needs."   *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted).   An official displays unconstitutional indifference when he knows of a substantial risk of serious harm and disregards that risk by denying medical treatment. So, absent some compelling reason, a prison doctor cannot deprive an inmate of care or medical devices he knows to be necessary.

Under these standards and the facts of this case, a jury could easily find that Dr. Ferrell defied the Constitution's commands and inflicted serious pain on Mr. Collins. In June 2017, Mr. Collins, an inmate at Ware State Prison, underwent surgery to remove a prominent fragment of his kneecap. His discharge paperwork instructed him to use a walking aid, and to bear weight on his healing knee only as tolerated. After his surgery, Mr. Collins continued to struggle with knee problems; he felt chronic pain as he walked the prison's hilly terrain or stairs, experienced limited range of motion, and needed his prescribed cane to walk.

Dr. Ferrell, the Medical Director at Ware, provided care for Mr. Collins following his surgery. But by August 2017, Dr. Ferrell had become "tired of hearing about all this pain nonsense," Mr. Collins remembers him say. Without any inspection of Mr. Collins' knee, the doctor then confiscated Mr. Collins' prescribed walking cane. Mr. Collins was of course puzzled by this confiscation since it was clear that he needed the cane—indeed, Dr. Ferrell's own notes state that Mr. Collins was "using a cane" when he came to the appointment that very day. Instead of offering a medical explanation, however, the doctor only laughed at Mr. Collins' apparent confusion and then dismissed him from the room. Two days later, consistent with Dr. Ferrell's goal of compelling Mr. Collins' recovering knee to bear the full weight of his body, a nurse also confiscated Mr. Collins' wheelchair. Predictably, Mr. Collins' already-damaged knee could not bear his weight (247 pounds). While walking 10 days later, Mr. Collins reinjured his left knee, which led to months of additional pain and another surgery.

In between the reinjury and additional surgery, Dr. Ferrell provided several ineffective pain-management treatments. Mr. Collins repeatedly requested—and his orthopedic surgeon (Dr. Mark Winchell) repeatedly recommended—a treatment that had provided relief for him in the past (Tylenol #3). Dr. Ferrell refused and instead continued to administer unhelpful pain treatment.

Faced with all this evidence, a reasonable jury could find that Dr. Ferrell deprived Mr. Collins of his mobility aids and effective pain medication, knowing the serious risk—indeed, the near certainty—that doing so would exacerbate Mr. Collins' pain and inflict further injury. The District Court nevertheless granted summary judgment in favor of Dr. Ferrell, primarily because it found his actions to be a legitimate exercise of medical judgment. As its main support, the District Court relied on Dr. Ferrell's own declaration setting out a medical rationale for his actions, but a jury could reasonably find Dr. Ferrell's self-serving account to be not credible. Such a determination would be well-supported by evidence conflicting with Dr. Ferrell's version of events— including Mr. Collins' testimony of how his cane was confiscated, the doctor's lack of medical explanation at the time of confiscation, and the doctor's steadfast refusal to administer effective, recommended treatment. Yet, rather than view this evidence in the light most favorable to Mr. Collins, the District Court actually cited Mr. Collins' testimony of the unexplained and hostile cane confiscation *as evidence supporting Dr. Ferrell.* That flips the summary judgment standard on its head. This Court should vacate and remand so that the competing evidence can be resolved by a jury, not a judge.

3

## STATEMENT OF JURISDICTION

Mr. Collins' deliberate-indifference claims arise under the laws of the United States. *See* 42 U.S.C. § 1983; U.S. Const. amends. VIII, IV. Accordingly, the District Court properly exercised federal question, subject matter jurisdiction under 28 U.S.C. § 1331.

On October 28, 2021, the District Court entered final judgment terminating Mr. Collins' action. Doc. 120. Mr. Collins then moved for reconsideration under Fed. R. Civ. P. 59(e). Doc. 121. On November 8, before the District Court ruled on Mr. Collins' motion for reconsideration, Mr. Collins filed a notice of appeal. Doc. 124. The District Court denied Mr. Collins' motion for reconsideration on November 15, Doc. 128, at which time the notice of appeal became effective. *See* Fed. R. App. P. 4(a)(4)(B)(i). Because Mr. Collins timely appealed from a final judgment, this Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    A prison doctor exhibits deliberate indifference anytime he knows of a substantial risk of serious harm and recklessly disregards that risk. Here, following Mr. Collins' knee surgery, he experienced limited range of motion and knee pain. Dr. Ferrell, "tired of hearing about all this pain nonsense," nonetheless deprived Mr. Collins of his prescribed mobility aids—without explaining his actions to Mr. Collins or even examining his knee. Based on these facts, could a reasonable jury find that Dr. Ferrell was deliberately indifferent to Mr. Collins' need for a walking cane and wheelchair?

4

2. Deliberate indifference can be shown through a prison official's disregard of an inmate's pain. Here, after his surgery, Mr. Collins continued to suffer from chronic knee pain, especially following his reinjury. Only Tylenol #3 had provided long-term relief from his pain, and Dr. Winchell repeatedly recommended that Mr. Collins be prescribed Tylenol #3. Dr. Ferrell refused to prescribe Tylenol #3 and instead cycled through treatment known to be ineffective. Under these circumstances, could a reasonable jury find that Dr. Ferrell displayed deliberate indifference to Mr. Collins' pain?

## STATEMENT OF THE CASE

### A. Mr. Collins breaks his kneecap, receives surgery, and uses a walking cane and Tylenol #3 to cope with pain.

In 1994, Mr. Collins injured his left knee during a high school football game. Doc. 86-5 at 59:15–20.[2] His injury, a tear in the inner and outer ligaments around his kneecap, required surgery to repair. *Id.* at 60, 62–63. Mr. Collins has suffered from chronic pain in his left knee ever since his 1994 injury. *Id.* at 65:10–11.

Mr. Collins' knee pain increased after he transferred to Ware State Prison in early 2017, as he struggled to walk on the hilly outdoor terrain and stairs that separated his housing from the dining hall. *Id.* at 66–67, 166. By February 2017, a nurse had issued Mr. Collins a walking cane with a one-year prescription. *Id.* at 67–68; Doc. 95-4 at 10.

---

[2] "Doc." refers to the District Court document, and the pages cited are the ECF-stamped page numbers.

As Mr. Collins' pain worsened, Dr. Ferrell, the Medical Director at Ware, referred him to orthopedist Dr. Mark Winchell at Georgia State Prison. Doc. 86-3 at 2 ¶ 3.

In April 2017, Mr. Collins had his first appointment with Dr. Winchell. Doc. 86-5 at 65:18–23. During the appointment, Dr. Winchell prescribed Tylenol #3 and ordered an x-ray, which revealed "a prominent fragment" of Mr. Collins' kneecap that "was clearly not connected to the body" of his kneecap. Doc. 86-3 at 15; Doc. 86-5 at 69:9–24; 72:21–73:1.

On June 6, 2017, Dr. Winchell performed surgery to repair Mr. Collins' knee. To complete the operation, Dr. Winchell created a six-inch incision and then removed a "fairly sizable" fragment of Mr. Collins' kneecap. Doc. 86-3 at 16. Mr. Collins was discharged from the surgery unit with Dr. Winchell's treatment instructions. *See id.* at 17; Doc. 86-2 at 3 ¶ 13. Those instructions specify that Mr. Collin's left knee should be "weight [b]earing as tolerated" and that he should use "crutches [a]s needed." Doc. 86-3 at 17; *see also* Doc. 95-4 at 34 ("Wt Bear as tolerated."). Other instructions on the document communicated a particular time frame for treatment—including instructions to change the bandages within 72 hours, to keep the incision dry for one week, to see Dr. Winchell again in two weeks, to remain on a bottom bunk for six weeks, and to remove the staples in 10 days. Doc. 86-3 at 17. Notably, however, the instructions to bear weight on his knee only "as tolerated" and to use "crutches [a]s needed" did not have an end date. *Id.*; *see also* Doc. 86-5 at 75:9–10 (should walk only as much as he "can tolerate the pain").

6

Although the record does not show whether Mr. Collins received crutches, it does reflect that he relied on his already-prescribed walking cane, which had been issued in February 2017. *E.g.*, Doc. 86-3 at 37 ("Ambulatory to medical [with] cane"); *id.* at 39 ("Ambulatory [with] cane"); *id.* at 43 ("I[nmate] who walks [with] a cane"). After Mr. Collins' surgery, a nurse also prescribed a wheelchair for one year. Doc. 95-4 at 33.

Following surgery, Mr. Collins faced significant knee pain and other complications. Initially, his pain was treated with Tylenol #3, which contains an opioid, and he could not feel any pain. Doc. 86-2 at 3; Doc. 86-5 at 85–87. At the end of June, Dr. Ferrell halved Mr. Collins' Tylenol #3 dosage (from two pills three times a day to one pill three times a day), and Neurontin was prescribed. Doc. 86-3 at 6 ¶ 21. Within about 24 hours, Mr. Collins began feeling pain in his knee again. Doc. 86-5 at 86:13–21; *id.* at 89:10–13. So, at his next appointment after the dosage reduction, Mr. Collins requested that Dr. Ferrell increase the dosage; the doctor refused. *Id.* at 101.

The Tylenol #3 prescription expired altogether in late July 2017, and Dr. Ferrell did not renew it. Doc. 86-2 at 6 ¶ 22. Dr. Ferrell continued to treat Mr. Collins' pain with non-opioid drugs, including naproxen (an oral anti-inflammatory drug), Neurontin, and Voltaren gel (a topical anti-inflammatory drug), as well as physical therapy. *Id.* at 4–6. Unlike Tylenol #3, none of these treatments provided long-term relief. *See, e.g.*, Doc. 86-3 at 32 ("complaint [at] this time—[left] knee pain—Pt complains that he needs 2 Tylenol #3 tabs"); *id.* at 49 (noting complaints of "knee pain

7

since surgery" and that physical therapy and Voltaren are "not helpful"); Doc. 86-5 at 86:13–21; *id.* at 89:10–13.

Mr. Collins also struggled to regain his left knee's full capabilities. In late June 2017, Dr. Ferrell prescribed physical therapy to improve Mr. Collins' range of motion. Doc. 86-3 at 28 ("Recommended PT for ROM."). During his physical therapy consult the following month, Mr. Collins' knee was shown to bend only 80 degrees. *Id.* Despite his range-of-motion issues, Mr. Collins was "[a]mbulatory [with his] cane." *Id.* at 39. Even with his cane, his knee continued to hurt when he walked, *id.*, and he "complain[ed] of moderate to severe pain," *id.* at 36.

On August 1, 2017, Mr. Collins met with Dr. Winchell, who told him to walk only "as much as [he] can bear" and specifically instructed him to do so "with a cane." Doc. 86-5 at 120:17–19. At that time, Mr. Collins continued to struggle with range of motion. *Id.* at 121:18–19 (testifying that he could "bend [his] knee normal to some degree, then [he] couldn't go no further"). He also continued to experience pain. To manage the pain, Dr. Winchell recommended naproxen "in addition to Tylenol #3." Doc. 95-4 at 46; *see also* Doc. 86-5 at 121:1–3; Doc. 86-3 at 39 ("Tylenol #3 recommended restart by ortho"). Yet Dr. Ferrell refused to prescribe Tylenol #3. *See* Doc. 86-3 at 9 ¶ 31.

**B.    Growing "tired of hearing" about "this pain nonsense," Dr. Ferrell confiscates Mr. Collins' walking cane, and Mr. Collins' wheelchair is also taken.**

Less than a week later, on August 7, Mr. Collins visited Dr. Ferrell for a scheduled appointment.  Mr. Collins recalls the "first thing" Dr. Ferrell said:  "I'm tired of hearing about all this pain nonsense, and I'm taking you off that cane."  Doc. 86-5 at 124–25.  Initially, Mr. Collins interpreted Dr. Ferrell's comment as jest, so he refused to hand over his cane.  In response, the doctor "snatched the cane out of [Mr. Collins'] hand," told Mr. Collins, "that's it," and dismissed him from the room without any examination of his knee.  *Id.* at 125.  Still in disbelief, Mr. Collins "looked back at him" in confusion; instead of explaining his actions, Dr. Ferrell began "laughing at [Mr. Collins], real snarly like."  *Id.* at 125–26.  Then "it dawned on" Mr. Collins that the doctor confiscated his cane as a "personal" expression of "spite," rather than as an exercise of "medical judgment[]."  *Id.* at 126.

According to Dr. Ferrell's notes from that day, Mr. Collins came to his appointment "using a cane."  Doc. 86-3 at 43.  The notes further describe Mr. Collins as an inmate who "walks [with] a cane," suffers from "chronic pain" in his left knee, and needs physical therapy "for chronic [left] knee pain."  *Id.*  Despite these observations, the notes explain that Dr. Ferrell halved Mr. Collins' Neurontin pain medication and "confiscated" his walking cane.  *Id.*  The doctor wrote that there was "no reason to continue cane-assisted walking."  *Id.*  His notes, however, do not reflect a medical explanation for this conclusion.  *See id.*  Nor did he provide any explanation

9

to Mr. Collins, except to comment that he had become "tired of hearing about all this pain nonsense." Doc. 86-5 at 124–25. Moreover, Mr. Collins testified that Dr. Ferrell did not discuss the Neurontin treatment or physical therapy on August 7, 2018. *Id.* at 127–28. Although Dr. Ferrell prescribed physical therapy that same day, his confiscation of Mr. Collins' cane meant that his knees would have to bear the full weight of his body before therapy concluded.

The day his walking cane was confiscated, Mr. Collins drafted and signed a formal grievance against Dr. Ferrell. *Id.* at 330. That contemporaneous document describes the doctor's "brutish" disregard of Mr. Collins' pain, which Dr. Ferrell called "pain nonsense," as well as the violent "snatching" of Mr. Collins' cane. *Id.* Mr. Collins requested that his cane be returned and that he be placed back on Tylenol #3. *Id.*

Within less than two days of filing his grievance, Mr. Collins' wheelchair was also confiscated by a nurse, even though Mr. Collins had a prescription to have a wheelchair for another 10 months. *See* Doc. 86-3 at 44; Doc. 95-4 at 33. Although Dr. Ferrell does not recall directing anyone to take Mr. Collins' wheelchair, that action was consistent with his determination that Mr. Collins could not have a walking aid. Doc. 86-3 at 9 ¶ 29 ("I had determined that Collins should bear weight and walk and had not determined that he needed a wheelchair."). Mr. Collins promptly filed another grievance, asserting that the doctor ordered his wheelchair taken as retaliation for Mr. Collins' initial grievance. Doc. 41-2 at 103.

**C.    Ten days after Dr. Ferrell confiscated his walking cane, Mr. Collins reinjures his knee while walking.**

On August 17, 2017, ten days after Dr. Ferrell confiscated his walking cane, Mr. Collins reinjured his knee. While "walking up and down" some of the "hills and the slopes" in the prison compound, Mr. Collins felt a surge of pain "rush[]" to his already-sore knee. Doc. 86-5 at 141–42. He had not tripped, fallen, or twisted his knee. *Id.* at 142:15–21. Rather, he felt this sharp pain after "[p]utting too much weight on [his] knee." *Id.* at 141:25. Mr. Collins inspected his knee and observed blood pooling just beneath the surface of his scarred incision, *see id.* at 145:8–14, which he described to prison staff as a kind of drainage, *see* Doc. 86-3 at 45.

On request from another staff member, Dr. Ferrell met with Mr. Collins to see the knee for himself. *Id.* Mr. Collins remembers the doctor "made light of it" by suggesting that any drainage may have been from a hair follicle. Doc. 86-5 at 146; *see also* Doc. 86-3 at 45. According to Dr. Ferrell's records, he instructed Mr. Collins to "continue ambulating" as before. Doc. 86-3 at 45. Later that month, however, Mr. Collins was reissued a walking cane. Doc. 86-5 at 139:17–18. He was never given an explanation—medical or otherwise—for this sudden course reversal. *See id.* at 139–40. After Mr. Collins' cane access had been restored, his grievance was denied, with the false claim that Mr. Collins' "cane profile has not been discontinued." Doc. 41-2 at 95.

### D.    Dr. Ferrell refuses to prescribe Tylenol #3.

After his Tylenol #3 prescription expired in July 2017, Mr. Collins experienced months of serious pain, which the non-opioid pain medications did not appreciably mitigate.  Dr. Ferrell's notes indicate that other treatment—specifically, physical therapy and Voltaren cream—had proven "not helpful."  Doc. 86-3 at 49.  Nonetheless, Dr. Ferrell rejected Mr. Collins' requests for stronger medication.  *Id.* at 49, 51.  He did, however, refer Mr. Collins to Dr. Winchell for a consultation.

At his consultation, in November 2017, Mr. Collins requested "to get Tylenol #3 back for the pain."  *Id.* at 53.  Dr. Winchell again recommended Tylenol #3 and naproxen.  *Id.* at 42; *see also* Doc. 86-5 at 107.  Even still, Dr. Ferrell again refused to provide Tylenol #3.  According to his medical notes, Dr. Ferrell would "not order Tylenol #3 as recommended by [Mr. Collins'] orthopedist because I do not think it is a good idea," though his medical notes do not elaborate on what, if any, medical reasoning supported this conclusion.  Doc. 86-3 at 55.

Mr. Collins then filed another formal grievance against Dr. Ferrell, in which he highlighted his "great pain" without Tylenol #3.  Doc. 86-5 at 337.  His complaint was denied in January 2018.  *Id.* at 338.  And the same month, Mr. Collins' condition had deteriorated to the point where he could not continue physical therapy.  "Because I am not being treated with Tylenol Three," he wrote in a refusal-of-treatment form, "I can no longer endure Physical Therapy treatment."  Doc. 86-5 at 341.

### E.    Mr. Collins undergoes another knee surgery.

In June 2018, Dr. Winchell obtained and interpreted the results of a recently taken MRI of Mr. Collins' knee.  Doc. 86-3 at 74.  The MRI revealed a torn meniscus and possible ACL tear.  *Id.* at 86.  In light of this finding, Dr. Winchell performed a second surgery a month later, during which he found inflammation, observed that Mr. Collins' ACL had been somewhat stretched, and fixed "a clear parrot beak type tear" in Mr. Collins' meniscus.  *Id.* at 87.

From the end of July 2017 until this second prison surgery a year later, Mr. Collins suffered from chronic knee pain and was not treated with Tylenol #3.  *See, e.g.,* Doc. 86-3 at 9 ¶ 31; *id.* at 74 (noting "post op L knee pain"); *id.* at 75 ("Pt is complaining of increasing L knee pain.").

### F.    Mr. Collins files suit for deliberate indifference, which the District Court dismisses on summary judgment.

In September 2018, after Mr. Collins had exhausted his administrative remedies, he filed a *pro se* suit against Dr. Ferrell under 42 U.S.C. § 1983.  *See generally* Doc. 1. Through his complaint, Mr. Collins alleged that Dr. Ferrell repeatedly violated the Eighth Amendment through his deliberate indifference to Mr. Collins' serious medical needs.  Mr. Collins pointed specifically to the doctor's confiscation of his cane and wheelchair, claiming that the doctor snatched his cane out of animus and caused Mr. Collins to reinjure his knee while walking.  *Id.* at 10–11.  He also alleged that Dr. Ferrell repeatedly refused to follow pain treatment recommended by Mr. Collins' orthopedic

13

surgeon, Dr. Winchell, and that he instead opted to prescribe a host of medication known to be ineffective in relieving Mr. Collins' pain. *Id.* at 12–13.[3]

On the same day Mr. Collins filed his complaint, he also submitted a motion requesting appointment of counsel. Doc. 5. Mr. Collins' motion explained that "imprisonment will greatly limit his ability to litigate," especially because he had "limited access to the law library and limited knowledge of the law." *Id.* at 1. His motion was denied. Doc. 7. Over the course of the next two years, the parties filed various motions and took discovery.

After the discovery stage, Dr. Ferrell moved for summary judgment, mainly arguing that the evidence did not support Mr. Collins' claims of deliberate indifference. *See* Doc. 86-1 at 9–14. Mr. Collins opposed the motion for summary judgment, still representing himself *pro se*. *See generally* Doc. 95. As he argued, the evidence "proves that Dr. Ferrell violently confiscated my walking cane" because the doctor "was tired of hearing about all of my pain nonsense," even though Mr. Collins' medical record made plain that his knee was to be weight bearing only "as tolerated." Doc. 95-2 at 61, 82. This deliberate indifference, Mr. Collins contended, inflicted pain and caused a new injury. *Id.* at 60. Mr. Collins also identified evidence to support his claim that Dr.

---

[3] Mr. Collins also named Nurse Practitioner Elizabeth Martyn as a defendant. *See* Doc. 1. She filed an unopposed motion to dismiss the claims against her, which the District Court granted. *See* Docs. 41, 46, 50, 51. Mr. Collins does not challenge that decision on appeal.

Ferrell had likewise discontinued Mr. Collins' wheelchair in response to the grievance he filed against the doctor. *Id.* at 74–77. Finally, Mr. Collins pointed to evidence supporting the inference that Dr. Ferrell had deviated from Dr. Winchell's recommendations and opted instead to treat Mr. Collins' pain with treatment Dr. Ferrell knew to be ineffective. *See, e.g.*, *id.* at 92–94.

In September 2021, Magistrate Judge Benjamin Cheesbro issued a report and recommendation in favor of granting Dr. Ferrell's motion for summary judgment. In that report, the Magistrate Judge accepted Dr. Ferrell's assertion that he grounded his decisions in medical judgment. *See, e.g.*, Doc. 111 at 17 ("Defendant chose to stop prescribing Plaintiff Tylenol #3 based on his own medical judgment."); *id.* at 18 ("Defendant also provided evidence his decision to prohibit Plaintiff from using a wheelchair or cane was a medical decision."). The report did not mention Mr. Collins' description of his cane-confiscation appointment, except to cite his testimony as somehow providing evidence that Dr. Ferrell confiscated the cane based on medical judgment. *Id.* at 11–12. Having bypassed Mr. Collins' testimony, the report deemed his claims to be frivolous disagreements over the best "course of treatment." *Id.* at 19, 22.

Over Mr. Collins' objections, *see generally* Doc. 117, the District Court adopted the report and recommendation as its own opinion. Doc. 119 at 1–2.[4] In its analysis,

---

[4] In doing so, the court also adopted the report's recommendations (i) not to consider errata sheets Mr. Collins submitted to change certain responses during his

the court emphasized that Mr. Collins received other treatments, though the court did not analyze whether these treatments effectively managed Mr. Collins' pain. *Id.* at 6. And while the District Court recognized that Dr. Ferrell "departed from Dr. Winchell's treatment plan by confiscating Plaintiff's cane [and] changing his medication regimen," it nonetheless credited Dr. Ferrell's reasons for deviating from the orthopedic surgeon's treatment plan and thus found that Dr. Ferrell merely exercised his medical judgment. *Id.* at 4. Yet the District Court neither mentioned Mr. Collins' account of his cane confiscation nor discussed Mr. Collins' testimony that Dr. Ferrell snatched his cane after growing "tired of hearing about all this pain nonsense." Doc. 86-5 at 124–25.

Mr. Collins now appeals, with counsel appointed by this Court. *See* Docs. 124, 130, 136.

## SUMMARY OF THE ARGUMENT

**I.** This case presents a textbook clash between two conflicting versions of events. Dr. Ferrell claims to have medically determined that Mr. Collins should ambulate on his knee without any mobility aids. By contrast, Mr. Collins testified that the doctor snatched his prescribed walking cane after announcing irritation with Mr. Collins' "pain nonsense"—without further explanation or any examination of Mr. Collins' knee. Under the doctor's version, his actions may have been negligent but not

---

deposition and (ii) to grant summary judgment on Dr. Ferrell's failure to request an MRI. Doc. 111 at 3–7, 19. Mr. Collins does not challenge these decisions on appeal.

unconstitutional.  But on Mr. Collins' account, the doctor's actions had nothing to do with medical treatment.  The actions instead displayed deliberate indifference as the doctor disregarded what he knew to be the substantial risk of harm caused from compelling Mr. Collins' still-recovering knee to bear his 247-pound body.

There is no serious question that Mr. Collins needed mobility aids.  For starters, his wheelchair and walking cane had been prescribed.  Moreover, Dr. Winchell's discharge paperwork directed Mr. Collins to use a walking aid and bear weight on his knee only "as tolerated."  He repeated the same instruction to Mr. Collins during their appointment less than a week before Dr. Ferrell confiscated the cane.  In any event, it would be obvious to any layperson that Mr. Collins should not be forced to put his full weight (247 pounds) on his knee, just two months after major surgery.  Not only did his knee still hurt after his surgery, but it also had not recovered its full function and range of motion.  It is difficult to imagine a clearer need for a walking aid.

Despite the obvious risk posed by depriving Mr. Collins of his mobility aids, Dr. Ferrell did it anyway.  A jury could find his conduct to have been deliberately indifferent. Taken in the light most favorable to Mr. Collins, the facts demonstrate that the doctor lashed out against Mr. Collins for complaining about his pain, or at the very least, that the doctor provided such cursory treatment as to amount to no treatment at all.  Either way, he violated the Eighth Amendment.

*First*, the jury might reasonably conclude that the doctor was deliberately indifferent because he knew Mr. Collins would likely suffer pain and further injury

without his mobility aids but deliberately disregarded that risk, without any medical reason for doing so. To be sure, the doctor's declaration (submitted in support of his summary judgment motion) sets out a medical justification for his actions, which the District Court accepted at face value. In doing so, however, the District Court wrongly played the part of the factfinder. A reasonable jury could have relied on substantial contrary evidence to find in favor of Mr. Collins. For instance, Mr. Collins testified that the doctor expressed irritation with "all this pain nonsense" just before "snatching" his cane, that the doctor did not offer a medical explanation, and that he instead only laughed at Mr. Collins' confusion. Crediting such facts, a jury could reasonably determine that Dr. Ferrell's actions had nothing to do with medical care and everything to do with personal frustration.

*Second*, a reasonable jury could find that Dr. Ferrell exhibited deliberate indifference by providing such cursory treatment that it amounted to no treatment at all. Dr. Ferrell went against Dr. Winchell's express instruction that Mr. Collins use a walking aid (either crutches or a cane) and confiscated Mr. Collins' prescribed medical aids—all without bothering to inspect Mr. Collins' knee or ask about his ability to walk unaided. The doctor made remarkably short work of this serious decision, despite seeing Mr. Collins hobbling into that very appointment "using his cane." Again, that would support a reasonable finding of deliberate indifference. The District Court therefore reversibly erred in failing to reserve this question for the jury.

18

**II.**    It was also for the jury to decide whether Dr. Ferrell had been deliberately indifferent to Mr. Collins' pain by preventing the treatment Dr. Winchell had recommend and instead doggedly pursing ineffective treatments.  Prison doctors cannot choose treatment paths they know to be ineffective, while deliberately ignoring care that would ameliorate pain.  Yet, after first causing Mr. Collins to reinjure his knee, Dr. Ferrell then continued to administer pain treatment that had repeatedly proven unhelpful for Mr. Collins.  And Dr. Ferrell persisted down this road even though both Mr. Collins and his orthopedic surgeon had repeatedly asked that Mr. Collins be treated with Tylenol #3.  While the court pointed to competing evidence, that only confirms that the issue should be decided through trial, not summary judgment.  Accordingly, the District Court reversibly erred in granting summary judgment.

## STANDARD OF REVIEW

This Court reviews de novo the District Court's grant of summary judgment.  *See Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 721 (11th Cir. 2019).  Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Critically, at the summary judgment stage, a court must "view all the evidence and draw all reasonable inferences in the light most favorable to the non-moving party."  *Patel v. Lanier Cnty.*, 969 F.3d 1173, 1178 (11th Cir. 2020) (citation omitted).

19

## ARGUMENT

The Eighth Amendment forbids "cruel and unusual punishments." U.S. Const. amend. VIII. Under settled precedent, the Eighth Amendment prohibits any punishment imposing the "unnecessary and wanton infliction of pain," which occurs anytime a prison official injures an inmate through "deliberate indifference to serious medical needs of prisoners." *Estelle*, 429 U.S. at 104 (citation omitted). In the proceedings below, Dr. Ferrell did not contest that the confiscation of Mr. Collins' mobility aids and the denial of effective pain treatment injured Mr. Collins. The only question, therefore, is whether a reasonable jury could find that these actions constitute deliberate indifference. It could. The District Court reversibly erred in holding otherwise.

## I.    A REASONABLE JURY COULD FIND THAT DR. FERRELL WAS DELIBERATELY INDIFFERENT TO MR. COLLINS' NEED FOR PRESCRIBED MOBILITY AIDS.

The deliberate-indifference question turns on both an objective and a subjective analysis. *See Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004). For the objective component, a plaintiff must "set forth evidence of an objectively serious medical need"—meaning either evidence of a medical diagnosis or evidence that the need "is so obvious that even a lay person would easily recognize" the need for medical attention. *See Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). In either case, a serious medical need is one that, "if left unattended, pos[es] a substantial risk of serious harm." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (quotation marks and citation omitted).

20

To establish the subjective component of the deliberate-indifference test, a plaintiff must demonstrate a defendant's "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). Put differently, the subjective prong is satisfied anytime a prison "official act[s] or fail[s] to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834, 842 (1994); *see also id.* at 836–37 (equating deliberate indifference with criminal recklessness); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985) ("[K]nowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference."). The knowledge inquiry "is a question of fact 'subject to demonstration in the usual ways, including inference from circumstantial evidence.'" *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1327 (11th Cir. 2007) (quoting *Farmer*, 511 U.S. at 842). So, for instance, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 834, 842.

Here, a jury could reasonably find that Mr. Collins had an "objectively serious medical need" for his prescribed mobility aids. *Farrow*, 320 F.3d at 1243. It could further conclude that Dr. Ferrell subjectively disregarded his knowledge of the risk of serious harm to Mr. Collins when the doctor confiscated those aids. *See id.*

**A.    Evidence supports a reasonable finding of serious medical need for Mr. Collins' prescribed cane and wheelchair.**

From the evidence introduced in the District Court, a jury could easily find that Mr. Collins had an objectively serious medical need, one that would "pos[e] a substantial risk of serious harm" if left unattended. *Taylor*, 221 F.3d at 1258 (citation omitted). Dr. Ferrell never meaningfully contested the seriousness of Mr. Collins' medical need. *See* Doc. 86-1 at 11–13. And any such dispute would only underscore the evidence from which a jury could find in favor of Mr. Collins.

As an initial matter, this Court has held time and again that difficulty walking or pain from a damaged bone can satisfy the objective element of the deliberate indifference test. *See Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) (painful broken foot can be serious medical need), *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir. 1989) (jury's conclusion of serious medical need supported by evidence of plaintiff's leg collapsing under him, pain, and difficulty walking); *Parzyck v. Prison Health Servs., Inc.*, 290 F. App'x 289, 291 (11th Cir. 2008) ("[N]o doubt that, taking [plaintiff's] allegations as true, his condition presented a serious medical need" because it "prevented him from walking normally and caused him extreme pain on a daily basis.").

Moreover, Mr. Collins' need for a cane is supported by medical diagnoses and instructions. His orthopedic surgeon specifically instructed Mr. Collins to bear weight on his knee only "as tolerated"; the surgeon also recommended using a walking aid (crutches) "as needed." Doc. 86-3 at 17. And, of course, Mr. Collins' pain and range-

of-motion problems continued long after his surgery, as did the medical need for his cane and wheelchair. Indeed, he had been prescribed a wheelchair after surgery for *an entire year*. Doc. 95-4 at 33. If there was a chance he would need a wheelchair a year later, surely that means he needed a cane for more than two months after his major knee surgery.

Even on the day Dr. Ferrell confiscated Mr. Collins' walking cane, the doctor diagnosed Mr. Collins with "chronic pain" and actually prescribed physical therapy to address the pain. Doc. 86-3 at 43. The record thus establishes a diagnosed medical need for treatment generally and for a walking aid specifically.

In any event, a layperson would easily recognize the serious medical risk posed by confiscating the cane of a person who not only struggled with proper knee motion and pain after a major knee surgery, but also actively relied on his cane for assistance. *See Taylor*, 221 F.3d at 1258 (defining objective medical need in terms of substantial risk). The medical notes further reflect that Mr. Collins could walk *with his cane*, Doc. 86-3 at 37, 39, bolstering a reasonable inference that he could not walk properly without it. Under these circumstances, it would hardly take a doctor to detect the obvious medical risk from confiscating Mr. Collins' cane and forcing him to bear his 247 pounds on his still-recovering knee. *See id.* at 43.

23

### B. Evidence supports a reasonable finding that Dr. Ferrell disregarded a known risk of serious harm.

A reasonable jury could find that Dr. Ferrell confiscated Mr. Collins' prescribed mobility aids fully aware that doing so substantially risked afflicting Mr. Collins with additional pain and reinjury. Although the District Court deemed Dr. Ferrell's actions as making medical judgments on how best to treat Mr. Collins, that view ignores substantial evidence to the contrary. Indeed, viewed in the light most favorable to Mr. Collins, the evidence demonstrates that Dr. Ferrell left the realm of medical care by seizing Mr. Collins' mobility aids based on personal irritation with Mr. Collins—or at the very least, after such cursory treatment as to be no treatment at all. And, contrary to the District Court's suggestion, the fact that the doctor had provided other medical treatment does not shield him from liability for lashing out at Mr. Collins or providing what can at best be described as grossly inadequate care.

### 1. A reasonable jury could find that Dr. Ferrell confiscated Mr. Collins' mobility aids as a reckless expression of frustration, not an exercise of medical judgment.

"A complete denial of readily available treatment for a serious medical condition constitutes deliberate indifference." *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011); *see also Harris v. Coweta Cnty.*, 21 F.3d 388, 394 (11th Cir. 1994) ("[F]ailure to provide diagnostic care and medical treatment known to be necessary . . . establishes deliberate indifference sufficient to establish a constitutional violation." (citation omitted) (brackets omitted)). Similarly, a prison doctor runs afoul of the Eighth

Amendment if he denies—or even delays—needed medical care for non-medical reasons. *E.g.*, *Ancata*, 769 F.2d at 704 ("[I]f necessary medical treatment has been delayed for non-medical reasons, a case of deliberate indifference has been made out."); *Bingham*, 654 F.3d at 1176 (similar).[5] For example, a prison doctor cannot deliberately deny or inexplicably delay an inmate's access to critical medical devices, such as prosthetics, hearing aids, glasses, and dentures. *See Gilmore v. Hodges*, 738 F.3d 266, 274–75 (11th Cir. 2013).

This Court's decision in *Farrow v. West* demonstrates these principles in action. There, a prison doctor prescribed dentures for an inmate after the inmate had described his pain in eating with few teeth and had informed the doctor of recent weight loss. 320 F.3d at 1239. In a follow-up visit before the dentures were made, the doctor recommended a physical examination out of concern for the inmate's weight loss. *Id.* In the same visit, however, the inmate complained about the delay in obtaining dentures, and the doctor stated that he was "sick of being bother[ed] with [the inmate]." *Id.* at 1240. It then took months before the plaintiff's dentures were ready, a delay that the doctor never explained. *Id.* at 1247.

---

[5] Although medical decisions may take security or budgetary concerns into account, *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1274 n.5, 1276–77 (11th Cir. 2020), Dr. Ferrell never pressed these non-medical concerns below, and the record does not support them in any event.

This Court held that the record, under the plaintiff's "version of the events, creates a jury issue" on whether the doctor exhibited deliberate indifference. *Id.* at 1242. After all, the plaintiff had "repeatedly told [the doctor] about his pain" and described his unhealthy condition, thus alerting the doctor to the serious medical condition and the risk of harm that would be inflicted without dentures. *Id.* at 1246. As the Court held, the jury could infer deliberate indifference from the fact that the delayed treatment was never explained, medically or otherwise. *See id.* at 1248; *id.* at 1246 (observing that a defendant who fails to administer "necessary treatment for non-medical reasons may exhibit deliberate indifference"). Finally, the evidence supported a finding that the doctor had "purposefully refused" treatment because he was "sick of being bothered with him." *Id.* at 1248 (brackets omitted). The Court thus concluded that these factual issues should have been committed to the jury.

That case is this case in every material way. Like the plaintiff in *Farrow*, Mr. Collins needed his medical devices to relieve his pain and prevent further deterioration in his health, which predictably came less than two weeks after his cane and wheelchair were seized. Dr. Ferrell knew of Mr. Collins' medical need and the serious risk of harm posed by depriving him of his cane and wheelchair. He learned this information in the same way the doctor in *Farrow* did—through interactions with his patient. Mr. Collins repeatedly told the doctor of his pain, had observable struggles with his knee's range of motion, and had been "using [his] cane" the very day Dr. Ferrell confiscated it. Doc. 86-3 at 43 (describing Mr. Collins as someone who "walks [with] a cane" and suffers

26

"chronic pain" requiring physical therapy); *id.* at 36 ("I[nmate] who complains of moderate to severe pain following [left] knee surgery"); *id.* at 32; *id.* at 28 (recommending "PT for ROM").

In addition to his bumpy road to recovery, Mr. Collins' medical history further underscored the need for special care in his treatment.  Recall that the surgery Dr. Winchell initially performed had itself been necessary to correct Mr. Collins' knee after he *reinjured* it following a surgery completed in the 1990's.  Doc. 86-5 at 62–63.  Consequently, the substantial risk of yet another knee injury requiring yet another surgery would have been as apparent then as it is now.  Even if this medical history were not enough, Dr. Winchell's post-operation instructions remove all doubt that Mr. Collins was to ease back into walking, bearing weight only "as tolerated" and using "crutches as needed."  Doc. 86-3 at 17.  It bears repeating that these directions—unlike several other instructions in the same paragraph—did not have an end date.  *Id.*  Faced with this evidence, a jury could reasonably find that Dr. Ferrell was aware of the obvious risk of harm that awaited Mr. Collins if his still-recovering knee were forced to bear the full weight of his 247-pound body.  *See Farrow*, 320 F.3d at 1239; *Farmer*, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

Yet, like the doctor in *Farrow*, Dr. Ferrell ignored all the warning signs and intentionally disregarded the substantial risk of serious harm.  *Farrow*, 320 F.3d at 1246–48.  Crediting Mr. Collins' account, a jury could determine that Dr. Ferrell "snatched"

27

Mr. Collins' cane and denied him wheelchair access because the doctor had grown "tired of hearing about all this pain nonsense," Doc. 86-5 at 124–25, just as a jury could have done after the doctor in *Farrow* said he was "sick of being bothered with [the inmate]," *Farrow*, 320 F.3d at 1240 (brackets omitted). Importantly, Dr. Ferrell did not even attempt to justify his decision in his notes or to explain it to Mr. Collins. Doc. 86-3 at 43 ("no reason to continue cane-assisted walking"); Doc. 86-5 at 125–26 (testifying that Dr. Ferrell "snatched" his cane and said, "That's it. You can go back to the room now."). Rather than offer an explanation, Dr. Ferrell only laughed at Mr. Collins' bewilderment, further confirming that the doctor's actions lacked any medical rationale. *Compare* Doc. 86-5 at 126 ("laughing at me, real snarly like"), *with Mandel*, 888 F.2d at 789 (listing defendant's laughter at mother's concern for her inmate son's medical care as evidence of deliberate indifference). Accordingly, here as in *Farrow*, a jury could reasonably find that the doctor had left the realm of medical treatment and deprived his patient of care based on personal irritation. *See* 320 F.3d at 1248.

Despite the wealth of evidence supporting Mr. Collins' version of events, the District Court granted summary judgment in favor of Dr. Ferrell because the doctor had "provided evidence [that] his decision to prohibit Plaintiff from using a wheelchair or cane was a medical decision." Doc. 111 at 18.[6] The only evidence cited was Dr.

---

[6] In its analysis, the District Court stated that Dr. Ferrell "denied Plaintiff's wheelchair profile on August 9, 2017." Doc. 111 at 18. It found this denial to be an unproblematic "pursuit of [an] alternative treatment." *Id.* That argument fails since a jury could reasonably disagree. The court's background section, however, states that a

Ferrell's own declaration in support of his motion for summary judgment. *Id.* In his declaration, Dr. Ferrell admitted that he had confiscated Mr. Collins' cane, but he stated that that he believed Mr. Collins "was relying too much on the cane" and "not putting in sufficient effort while walking to maintain and increase the range of motion in his knee." Doc. 86-3 at 8–9. Admittedly, a medical decision to refuse mobility aids and pursue alternative treatment ordinarily would not violate the Constitution. *See* Doc. 111 at 15, 18. But if Dr. Ferrell *lacked* a medical reason to deprive Mr. Collins of necessary medical devices, the doctor would have acted with deliberate indifference. *See Farrow*, 320 F.3d at 1246–48; *Ancata*, 769 F.2d at 704 (medical professions cannot delay treatment "for non-medical reasons").

On that material question, there remains a genuine dispute, and the District Court reversibly erred by adopting Dr. Ferrell's contested account. A jury could easily dismiss Dr. Ferrell's self-serving justification as a *post hoc* rationalization at odds with other record evidence, including the doctor's own expression of frustration over Mr. Collins' "pain nonsense" that immediately preceding his then-unexplained confiscation.

---

nurse discontinued Mr. Collins' wheelchair profile, without any direction from Dr. Ferrell to do so. *Id.* at 12. While this statement did not play any role in the court's reasoning, it is nonetheless worth mentioning that Dr. Ferrell only disclaims any *recollection* of ordering the nurse to confiscate the wheelchair. Doc. 86-3 at 9. Moreover, a reasonable inference could be drawn that Dr. Ferrell knew about Mr. Collins' wheelchair since he kept abreast of his medical record. *See id.* at 5 ¶ 23. And because Dr. Ferrell had clearly intended to compel Mr. Collins to walk without aids, *id.* at 8 ¶ 29, it does not take a leap of logic to conclude that the doctor would have ordered Mr. Collins' wheelchair taken soon thereafter.

Doc. 86-5 at 125. Viewed in the light most favorable to Mr. Collins, such facts put the lie to Dr. Ferrell's supposed medical justification and confirms that his actions had nothing to do with medical care.[7]

Although the District Court knew of this competing evidence, it did not count the evidence in favor of Mr. Collins. Indeed, it appeared to do just the opposite: The court cited to Mr. Collins' deposition testimony explaining how his cane was confiscated as evidence that the cane was confiscated for *medical reasons*. Doc. 111 at 11–12 ("Because Defendant believed a cane was no longer medically appropriate, he confiscated Plaintiff's cane." (citing Mr. Collins' testimony, Doc. 86-5 at 123, 125)). That completely inverts the summary judgment standard. *See Patel*, 969 F.3d at 1178–79 ("draw[ing] all reasonable inferences in [the non-movant's] favor").

In any case, Dr. Ferrell's version of events independently fails on its own terms. If it were medically necessary for Mr. Collins to ambulate without mobility aids, as the doctor claims in his declaration, why would the cane be restored in the same month in which it was confiscated? Dr. Ferrell never attempted to answer this question, and Mr. Collins likewise never heard an explanation. *See* Doc. 86-3 at 1–12; Doc. 86-5 at 139–

---

[7] The District Court also relied on Dr. Ferrell's Statement of Material Facts. Because of perceived defects in Mr. Collins' *pro se* responses to the Statement, the District Court accept the Statement's facts as true "so long as they are supported by the evidence, do not make credibility determinations, and do not involve legal conclusions." Doc. 111 at 8. But the Statement did "make credibility determinations" by accepting at face value Dr. Ferrell's disputed account of the reason for his treatment decisions. The District Court erred when it likewise adopted Dr. Ferrell's version of events.

40.  Far from it.  Once Mr. Collins could use a cane again, prison officials actually claimed that it had never been confiscated, denying Mr. Collins' grievance on the false premise that "[h]is [cane] profile was not discontinued as he alleges."  Doc. 41-2 at 95.

In theory, one reason for restoring Mr. Collins' cane could be his August 17 reinjury.  But that explanation does not match Dr. Ferrell's version of events.  According to his medical notes, the doctor told Mr. Collins to "continue ambulating" as before, and he dismissed Mr. Collins' complaints as perhaps relating to drainage from a hair follicle.  Doc. 86-3 at 45; *see also* Doc. 86-5 at 146 (Dr. Ferrell "made light of" the reinjury).  Thus, from the doctor's account, it makes no sense to deprive Mr. Collins of his prescribed cane, only to reverse course yet again and restore the cane.  *See* Doc. 86-5 at 158 (noting that Dr. Ferrell allowed Mr. Collins to keep his cane).  Dr. Ferrell's inexplicable flip-flopping—from permitting a cane, to confiscating it, to permitting it again—fatally undermines any claim of medical decision-making.  At the very least, a reasonable jury could find as much.

Given the conflicting evidence—including Mr. Collins' account of the cane confiscation against Dr. Ferrell's *post hoc* justification—the District Court erred in granting summary judgment.

### 2. At minimum, a reasonable jury could find that Dr. Ferrell provided grossly inadequate, cursory treatment that was not medical care at all.

The District Court also overlooked how the evidence here demonstrates deliberate indifference though Dr. Ferrell's hasty and wholly uninformed decision to

31

cast aside necessary treatment.  Under this Court's caselaw, deliberate indifference can "be established by a showing of grossly inadequate care." *McElligott*, 182 F.3d at 1255. Relatedly, "medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Id.* (quoting *Mandel*, 888 F.2d at 789); *accord Ancata*, 769 F.2d at 704.  Here, substantial evidence plainly supports a finding of grossly inadequate and cursory treatment, as made clear by on-point Eleventh Circuit precedent.

This Court's decision in *Steele v. Shah* controls this case.  *See* 87 F.3d 1266 (11th Cir. 1996).  In *Steele*, an inmate claimed that his psychiatrist discontinued nearly all his prescribed medications within less than one minute of their first meeting and without reviewing his medical records.  *Id.* at 1267.  According to the inmate, his psychiatrist "refused to discuss the matter and simply told [the inmate] that he was 'dismissed.'"  *Id.* The doctor submitted contrary evidence, including a psychiatric evaluation prepared by the doctor himself on the date of the meeting.  That evaluation form depicted the inmate as having been "cooperative" and having "answered a number of questions, demonstrating no symptoms that would require psychotropic drugs or any treatment beyond 'supportive therapy.'"  *Id.* at 1268.  Because these two accounts "directly contradicted" each other—"both as to the tone, the content and the duration of th[e] initial encounter"—this Court found summary judgment inappropriate to resolve the case.  *Id.* at 1268, 1270.  A jury could, of course, credit the inmate's account.  If it did so, the jury would then be "entitled to find" that the doctor discontinued the inmate's prescribed treatment "on the basis of one cursory interview."  *Id.* at 1270.  From there,

the jury could infer that the doctor had deliberately disregarded what he knew to be the substantial risk of thoughtlessly abandoning prescribed treatment. *Id.*

So too here. Crediting Mr. Collins' version of events, a jury could likewise find that Dr. Ferrell had reversed Mr. Collins' prescribed treatment based on what could at best be called a "cursory interview." Specifically, Dr. Ferrell began the August 7 appointment by telling Mr. Collins that he was "tired of hearing about all this pain nonsense" and was confiscating Mr. Collins. Doc. 86-5 at 124–25. Once he had "snatched the cane out of [Mr. Collins'] hand," Dr. Ferrell then dismissed him. *Id.* at 125. Their meeting was "a real brief appointment." *Id.* at 123. They did not discuss any other treatments or reasons not to use a cane. *Id.* at 127–28.

More importantly, the doctor deprived Mr. Collins of his prescribed walking cane (and later his wheelchair) without bothering to inspect his knee or ask any questions about it. *See id.* at 198:7–10; *id.* at 125 ("No looking at my knee. No nothing."). Had the doctor inquired about Mr. Collins' condition, he could have learned that Dr. Winchell had—one week before—again emphasized that Mr. Collins needed to "walk with a cane." *Id.* at 120. But Dr. Ferrell did not ask. He instead came to the appointment having apparently predetermined his course of "treatment," regardless of Mr. Collins' actual medical need. Just as in *Steele*, a jury could find that the doctor recklessly and unconstitutionally abandoned prescribed treatment merely "on the basis of one cursory" encounter. *Steele*, 87 F.3d at 1270.

33

If anything, the challenged conduct here was more reckless than in *Steele*. Unlike the doctor there, Dr. Ferrell *had treated* Mr. Collins in the past and would have known that the cane served a critical part in Mr. Collins' recovery. Dr. Ferrell had heard from Mr. Collins about his chronic knee pain. *E.g.*, Doc. 86-3 at 32, 36, 43. Moreover, the doctor likely had seen Dr. Winchell's written instructions for Mr. Collins to use a walking aid and ambulate only "as tolerated." *Id.* at 17; *see also* Doc. 86-2 at 7 ¶ 36 ("Dr. Ferrell kept abreast of Mr. Collins' medical needs by . . . reading the medical records of other medical providers' evaluations . . . ."). Equally important, Dr. Ferrell had seen first-hand Mr. Collins' heavy weight, limited knee function, and dependence on a cane. *See* Doc. 86-3 at 28 ("PT for ROM"); *id.* at 43 ("I[nmate] . . . comes in today using a cane."). Dr. Ferrell thus abandoned Mr. Collins' treatment with eyes wide open to the substantial risk of doing so, and he took that step without first assessing Mr. Collins' knee.

Granted, Dr. Ferrell has submitted medical notes from the day he deprived Mr. Collins of his prescribed treatment, which unsurprisingly paint a rosier picture of a more thorough examination. *Id.* at 43. Yet the same was true in *Steele*. Though the doctor's notes contradict Mr. Collins' version "as to the tone, the content and the duration" of the appointment, the competing accounts only demonstrate the need for a jury. *Steele*, 87 F.3d at 1268, 1270. What matters is that Mr. Collins' testimony supports a reasonable inference of deliberate indifference. *See id.* Based on his account, a jury could reasonably find Dr. Ferrell's sudden discontinuation of prescribed treatment to

be "so cursory as to amount to no treatment at all," in violation of the doctor's constitutional duty. *Ancata*, 769 F.2d at 704.

### 3. A reasonable jury could find deliberate indifference even though Dr. Ferrell had provided some other medical treatment.

In addition to improperly crediting Dr. Ferrell's account, the District Court wrongly assumed that Mr. Collins' claims must fail because he "does not dispute he received other treatment and medication." Doc. 111 at 20. But it "simply misstates the controlling law" to say that the "provision of medical care to [an inmate] precludes an Eighth Amendment claim." *McElligott*, 182 F.3d at 1259.

Although courts "hesitate to find an Eighth Amendment violation" when an inmate has received some medical care, hesitation does not mean "that the course of a physician's treatment of a prison inmate's medical or psychiatric problems" is necessarily beyond the reach of a deliberate-indifference claim. *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989). In fact, this Court has repeatedly held that a jury could find a medical professional deliberately indifferent even when they have administered some treatment. *See, e.g.*, *Mandel*, 888 F.2d at 785–86, 790 (jury could find physician assistant's prescription of Motrin, bed rest, followed by aspirin and then by muscle relaxant, was deliberately indifferent to inmate's fractured hip joint); *Carswell v. Bay Cnty.*, 854 F.2d 454, 455 (11th Cir. 1988) (upholding finding of deliberate indifference despite physician assistant's repeated examinations of the inmate, whose requests for medication were sometimes satisfied); *Rogers v. Evans*, 792 F.2d 1052, 1062

(11th Cir. 1986) ("Even if [the doctor] provided a period of attentive, competent care to [the inmate], one episode of gross conduct would be sufficient for a jury to make a finding of deliberate indifference."). That makes perfect sense: It cannot be that providing some medical treatment absolutely shields a doctor and then allows him to provide grossly inadequate treatment with impunity. *See McElligott*, 182 F.3d at 1258–59.

Contrary to the District Court's suggestion, this Court's decision in *Adams* does not disturb that settled principle. The defendant there, a physician assistant, had properly administered breathing treatment that had been successful in the past, called for an ambulance when the treatment did not resolve the inmate's problem, and remained with the patient until the ambulance arrived. *Adams v. Poag*, 61 F.3d 1537, 1546–47 (11th Cir. 1995). Although the inmate died, the defendant's liability hinged only on "whether his failure to administer stronger medication to [the patient] pending the arrival of the ambulance constituted deliberate indifference." *Id.* at 1547. That question involved a close "medical judgment"—especially because the hospital "was located only one-half of a mile away"—and the Court thus found it to be "an inappropriate basis for imposing liability." *Id.*

That case is worlds apart from this one. Indeed, the two cases look alike only if one takes Dr. Ferrell at his word, crediting his assertion that his decisions here were made as an exercise of medical judgment. But a jury has ample reason not to credit the doctor's self-serving claim: Unlike the physician assistant in *Adams*, who administered

previously successful treatment, Dr. Ferrell intentionally *discontinued* effective, prescribed treatment. And it would be reasonable to find that he did so without exercising any medical judgment whatsoever, disregarding the known and substantial risk that his confiscations would injure Mr. Collins.

## II. A REASONABLE JURY COULD FIND THAT DR. FERRELL'S FAILURE TO PROVIDE EFFECTIVE AND RECOMMENDED PAIN TREATMENT CONSTITUTED DELIBERATE INDIFFERENCE.

The District Court further erred in finding no triable issue on Dr. Ferrell's months-long administration of ineffective pain treatment. Dr. Ferrell has not contested Mr. Collins' serious medical need for pain treatment. Understandably so. The need was obvious since Mr. Collins had repeatedly vocalized his pain and even discontinued physical therapy because of it. If that were not enough, Dr. Winchell specifically recommended a stronger pain medication (Tylenol #3) in early August 2017 and then again in November 2017. Doc. 86-3 at 31, 42.

Accordingly, the only issue is whether Dr. Ferrell exhibited deliberate indifference to Mr. Collins' needs. He did, or so a reasonable jury might conclude. Substantial evidence demonstrates that Dr. Ferrell deliberately interfered with Dr. Winchell's prescribed treatment and instead persisted in a course of treatment known to be useless. Those actions support a reasonable inference of deliberate indifference.

**A.    Evidence supports a reasonable finding of intentional interference with recommended treatment.**

Prison officials generally cannot interfere with a doctor's recommended treatment.  *See Bingham*, 654 F.3d at 1176 ("An Eighth Amendment violation may also occur when state officials knowingly interfere with a physician's prescribed course of treatment."); *Ancata*, 769 F.2d at 704 ("Deliberate indifference to serious medical needs is shown when prison officials have prevented an inmate from receiving recommended treatment." (citation omitted)).  It is true that a physician need not "check his own medical training and judgment" at the prison gates and "subordinate his own professional judgment to that of another doctor." *Bismark v. Fisher*, 213 F. App'x 892, 897 (11th Cir. 2007).  But it is equally true that a prison doctor must actually exercise his "medical judgment" before disregarding another doctor's recommendations. *Id.*; *see also Ancata*, 769 F.2d at 704 (medical professions cannot delay treatment "for non-medical reasons").

Dr. Ferrell does not dispute that he prevented Mr. Collins from receiving Tylenol #3, the pain treatment that Dr. Winchell deemed necessary.  Doc. 86-3 at 8 ¶ 25.  On August 1, 2017, Dr. Winchell recommended that Mr. Collins be prescribed Tylenol #3. *Id.* at 31.  Rather than fill that prescription, Dr. Ferrell began and ended his next meeting with Mr. Collins by seizing Mr. Collins' walking cane and laughing at him.  Doc. 86-5 at 124–26.  Dr. Winchell again recommended Tylenol #3 in November 2017, after Mr.

Collins had suffered months of ongoing pain.  Doc. 86-3 at 42; *id.* at 53 ("I need to get Tylenol #3 back for the pain.").  Dr. Ferrell still refused.  *Id.* at 55, 57.

Once again, the factual dispute is over Dr. Ferrell's *reason* for denying Tylenol #3.  His purported medical rationale was concern over opioid abuse.  Doc. 86-3 at 6–7.  Opioid abuse is undoubtedly a legitimate concern, and if believed to be the reason for the doctor's treatment decision, it would be a valid reason to avoid Tylenol #3.  While the District Court credited Dr. Ferrell's purported justification, *see* Doc. 111 at 17–18, a jury has good reason not to.

To repeat, Dr. Ferrell had initially deviated from Dr. Winchell's recommendation at the same meeting he expressed his irritation with Mr. Collins' "pain nonsense."  Doc. 86-5 at 124–25.  That interaction colors the denial of treatment that followed, bolstering a reasonable inference that the doctor was recklessly acting based on exasperation rather than medical judgment.  *See supra*, Argument I.A.1.  Such an inference finds additional support in the absence of a clear contemporaneous explanation for Dr. Ferrell's actions:  His notes merely state that he did not think Dr. Winchell's recommendation was "a good idea."  Doc. 86-3 at 55; *see also id.* at 57 ("Orthopedic consult of 11-14-17 recommends Tylenol #3 on long-term basis.  I do not agree but request Neurontin be restarted.").  And Dr. Ferrell steadfastly refused Tylenol #3 knowing that none of his other treatments alleviated Mr. Collins' pain.  *See infra*, Argument II.B.

Rather than follow an effective and recommend course, Dr. Ferrell charted his own path and prescribed treatment that itself posed a significant risk of abuse.  Other

than anti-inflammatories, the main pain treatment Dr. Ferrell prescribed was gabapentin (Neurontin).  To fill that prescription, he completed a form that warned of the dangers of Neurontin:  "**Gabapentin is not FDA approved**" for use "in chronic pain to include peripheral neuropathy and chronic musculoskeletal pain."  Doc. 86-3 at 57 (bold in original).  According to the same form, "[g]abapentin is now recognized as a *medication that can be abused*."  *Id.* (emphasis added).  The serious risk of abuse prompted some prisons to eliminate Neurontin use altogether.  *Id.*  Even so, Dr. Ferrell chose to prescribe Neurontin, casting doubt on whether he in fact avoided Tylenol #3 for abuse-related medical reasons.

Considering these facts, a reasonable jury may well conclude not only that Dr. Ferrell interfered with Dr. Winchell's recommended treatment, but also that he did so without any medical reason.  Because these conclusions would mean deliberate indifference, *see Bingham*, 654 F.3d at 1176; *Ancata*, 769 F.2d at 704, the District Court erred in granting Dr. Ferrell's motion for summary judgment.

**B.    Evidence supports a reasonable finding of ongoing "treatment" that Dr. Ferrell knew to be ineffective.**

Even if Dr. Ferrell were not required to administer Tylenol #3, he was not permitted to insist on pain treatment he knew to be useless.  *See McElligott*, 182 F.3d at 1257; *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) (Eighth Amendment violated when "defendants doggedly persisted in a course of treatment known to be ineffective").  Precedent has long made clear that a prison doctor can display deliberate indifference

by opting "to take an easier and less efficacious course of treatment." *Waldrop*, 871 F.2d at 1033. This holds true when the medical care required is pain-management treatment. *McElligott*, 182 F.3d at 1257 ("[P]rison officials may violate the Eighth Amendment's commands by failing to treat an inmate's pain."). Indeed, it is a "core principle of Eighth Amendment jurisprudence" that prison officials who know of a need for medical care "may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness." *Id.* A reasonable jury could find that Dr. Ferrell intentionally disregarded Mr. Collins' pain when he doggedly administered treatment known to be ineffective.

*McElligott* sheds useful light here. One of the defendants in *McElligott*, a prison doctor, had visited an inmate five times during as many months and had taken some steps to diagnose the inmate's abdominal pain by ordering bloodwork, urinalysis, and the inmate's hospital records. *Id.* at 1252–53. The doctor had also rotated through prescriptions of anti-gas medication, Tylenol, pepto-bismol, an ulcer medication, and medication to aid digestion. *Id.* at 1252–53, 1257 & n.4. The inmate, however, repeatedly complained that these treatments had not meaningfully alleviated his pain, which persisted for months as the inmate's condition worsened.

This Court held that a reasonable jury might conclude that the doctor "knowingly provided grossly inadequate" and ineffective care. *Id.* at 1256. The inmate's complaints, coupled with the doctor's examinations, "were sufficient to create a question for the jury" on whether the doctor was "aware of a substantial risk of harm." *Id.* And a "jury

41

could infer deliberate indifference" because the doctor (i) "knew the extent of [the inmate's] pain," (ii) "knew that the course of treatment was largely ineffective," and (iii) "declined to do anything more to attempt to improve [his] condition." *Id.* at 1257–58 (citation omitted). Because the doctor persisted in administering useless treatment, "a jury could find that [the doctor] basically did nothing to alleviate th[e] pain," even as the inmate's condition deteriorated. *Id.* at 1257. The "easier but less efficacious course of treatment" could be understood as "deliberate indifference to the pain and suffering [the inmate] was experiencing." *Id.* at 1258 (quoting *Waldrop*, 871 F.2d at 1035).

The same is true here. First, Mr. Collins' complaints and interactions with Dr. Ferrell likewise create a jury question about the doctor's risk-of-harm knowledge. *E.g.*, Doc. 86-3 at 43 (noting complaints of "chronic pain" following surgery); *id.* at 51 (reflecting requests for pain medication and wheelchair); Doc. 86-5 at 337 (formal grievance reporting "great pain"). From these interactions, a jury could find that Dr. Ferrell also knew that his "course of treatment was largely ineffective." *McElligott*, 182 F.3d 1257–58. After all, Mr. Collins had told Dr. Ferrell that his treatments had not meaningfully alleviated the pain. *See, e.g.*, Doc. 86-3 at 32 (expressing need for stronger medication); *id.* at 49 (noting other treatments that were "not helpful"); *id.* at 51.

And Mr. Collins' condition had steadily deteriorated. Two and a half months after his August 17 reinjury, Mr. Collins reported that he could no longer "ascend nor descend upon his injured left knee, without falling to the ground or[] without great pains thereto." Doc. 86-5 at 334. By January, Mr. Collins "c[ould] no longer endure Physical

Therapy treatment." *Id.* at 341. Even still, Dr. Ferrell continued in his course of "treatment" for about six months before deciding to conduct a diagnostic MRI. Doc. 86-3 at 69. All the while, Dr. Ferrell merely cycling through "easier but less efficacious course of treatment" like the doctor in *McElligott* had done. *See* 182 F.3d at 1258.

Useless treatment is no treatment. So a jury could reasonably view Dr. Ferrell's months-long persistence in ineffective treatment as "basically d[oing] nothing to alleviate [Mr. Collins'] pain," which would establish his "deliberate indifference to the pain and suffering [Mr. Collins] was experiencing." *Id.* at 1257–58. *Contra Adams*, 61 F.3d at 1546–47 (medical decision whether to administer stronger medication in addition to already-provided and *previously successful* medication, while *briefly* waiting for the ambulance). The District Court therefore erred in granting the motion for summary judgment.

## CONCLUSION

This Court should vacate the judgment below and remand the case for further proceedings.

Dated: October 3, 2022                        Respectfully submitted,

                                             */s/ Caleb P. Redmond*
                                             Caleb P. Redmond
                                             JONES DAY
                                             51 Louisiana Ave., NW
                                             Washington, D.C. 20001
                                             Telephone: (202) 879-3690

                                             *Court-Appointed Counsel for*
                                             *Appellant Jamal Collins*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,289 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Garamond type.

Dated: October 3, 2022                    /s/ Caleb P. Redmond
                                          Caleb P. Redmond

**CERTIFICATE OF SERVICE**

I hereby certify that on October 3, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Caleb P. Redmond*
Caleb P. Redmond